IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Matthew Serota, derivatively on behalf of London Towne Homeowners Association | : : : : | |
| v. | : : | No. 820 C.D. 2021 |
| Matthew J. Mager a/k/a Matt Mager | : : : | |
| Appeal of: Matthew Serota | : | Argued: October 10, 2023 |

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE CEISLER                                    FILED: November 7, 2023

Matthew Serota, derivatively on behalf of London Towne Homeowners Association (Association), appeals from the July 9, 2021 Order of the Court of Common Pleas of Allegheny County (Trial Court) dismissing his Complaint with prejudice.  At issue in this appeal is the scope of a temporary receiver's powers with regard to derivative actions under the Nonprofit Corporation Law of 1988 (Nonprofit Law), 15 Pa. C.S. §§ 5101-6162.  This issue appears to be one of first impression in Pennsylvania, as we have found no Pennsylvania precedent involving a derivative action by a member of a nonprofit corporation that is under receivership.  For the reasons that follow, we affirm the Trial Court's Order.

## I. Background

The Association is a nonprofit corporation with registered offices at London Towne Drive in Pittsburgh, Pennsylvania.  The Association is a planned community comprised of 70 townhome units.  The Association's Declaration of Covenants,

Conditions and Restrictions, filed on June 14, 1979, provides: "Every [o]wner of a [l]ot which is subject to assessments shall be a member of the Association. Membership shall be appurtenant to and may not be separated from ownership of any [l]ot subject to assessment." Reproduced Record (R.R.) at 24a.

Mr. Serota owns 24 units in the Association and resides in the State of New York. Compl. ¶¶ 1, 7; R.R. at 144a. Matthew J. Mager co-owns one unit in the Association. Compl. ¶ 13.

On March 27, 2019, a group of unit owners calling themselves "Concerned Owners of Homes in London Towne Homeowners Association" (Concerned Owners) filed a Petition to Appoint a Receiver (Petition) in the Trial Court. In their Petition, Concerned Owners asserted a breach of fiduciary duty claim against the Association's then-President, Bennett Carlise, alleging, among other things, that he "failed to fulfill any of the duties set forth in the By[-L]aws to ensure the business of the Association was completed," was "unable and unauthorized to effectively manage the business of the Association," and "failed to properly account for the income and expenses of the Association." R.R. at 13a. Concerned Owners also alleged:

> 73. Due to the concerns of mismanagement of the Association and lack of progress of the desired objectives and dissolution of the Association, [C]oncerned [O]wners bring the within action against [Mr.] Carlise to protect the majority interests of the Association, and not just the interests of [Mr.] Carlise.

> 74. [C]oncerned [O]wners believe that the amicable winding up and dissolution of the Association is necessary, as the current structure is not sustainable for the future of the Association.

> 75. [C]oncerned [O]wners believe that due to the conflicts, the purpose of the Association will never be met and a mechanism is

2

necessary for the orderly dissolution of the Association and removal of [Mr.] Carlise.

*Id.* at 12a.

Concerned Owners also requested the appointment of a receiver to execute the involuntary dissolution of the Association, averring:

> 89. In light of the repeated failure to effectuate the business of the Association, the Executive Board's failure to dissolve the Association, the resignation of James DeMauro, and Sal Sirabella, and [Mr.] Carlise's disregard of the September 5, 2018 vote [of a majority of the unit owners to remove the Executive Board], [Concerned Owners] request that a receiver be appointed and the Association be dissolved.
>
> 90. There is dissension and an impasse among and between [Mr.] Carlise and many community unit owners as to the winding up of the affairs of the Association.
>
> 91. [C]oncerned [O]wners are unaware what, if any, assets and income of the Association are being disbursed and why.

*Id.* at 14a. Finally, Concerned Owners alleged that "[u]nless a receiver is appointed, . . . [Concerned Owners] may suffer further and irreparable harm." *Id.* at 15a.

On July 18, 2019, following a hearing, the Trial Court entered an Order appointing Robert G. Xides, Jr., Esquire, as Temporary Receiver (Receiver) for the Association. *See* 15 Pa. C.S. § 5984 (stating that in matters involving involuntary dissolution of a nonprofit corporation, a court may, upon application, "appoint a receiver *pendente lite* with such powers and duties as the court from time to time may direct"). In its Order, the Trial Court directed Receiver to file a report and recommendation with the Trial Court within 45 days and to convene at least one Association meeting "to adequately address [Concerned Owners'] concerns and make recommendations in that regard." R.R. at 94a. The Trial Court further stated

3

that Receiver had the authority "to collect assessments and make disbursements within the regular course of business." *Id.*

On December 12, 2019, the Trial Court entered an Order further empowering Receiver "to conduct the business of the [Association] on a continuing basis from July 18, 2019[,] . . . forward until issuance of a new Order of [the Trial] Court . . . ." *Id.* at 98a. The Order clarified that Receiver's authority "include[d] . . . levying and collecting assessments, making contracts for necessary services, and paying obligations of the Association as . . . Receiver may in his discretion determine." *Id.* The Order also provided that the Association's Executive Board members were "prohibited from individually or collectively exercising any powers of the Association, including but not limited to all those powers granted to . . . Receiver by this Order of [the Trial] Court." *Id.* at 99a.

On August 31, 2020, Mr. Serota emailed a letter to Receiver, "demand[ing] that] the Association[] . . . bring civil suit against unit owner, [Mr.] Mager[,] for his action of intentionally **Interfering With A Business Relationship** involving the . . . Association[] . . . ." R.R. at 144a (capitalization and bold in original). Mr. Serota asserted that "[u]pon information and belief, Mr. Mager had communications in September 2018 with the underwriter of [the Association's] Directors & Officer[]s insurance policy with the Ironshore Insurance Company[ (Ironshore)]. These communications were of such a threatening and negative nature that it caused Ironshore to withdraw the offered renewal policy contract." *Id.* Thus, Mr. Serota "formally demand[ed] that the Association[] . . . bring civil suit to enforce its rights and remedies at law for the benefit of itself and all shareholders/lot owners in interest." *Id.*

4

On September 4, 2020, Receiver emailed his response to Mr. Serota's demand letter, stating:

> I believe that the Pennsylvania statute of limitations makes acting upon the information impossible. Under [Section 5524 of the Judicial Code,] 42 Pa.[ ]C.S. § 5524, the requested civil suit would be subject to a two[-]year statute of limitations, which means that the action will be time barred at some undefined time this month. (Your letter only gives the general date of September 2018 for the alleged communications.)
>
> If there were time to do so, an investigation of Mr. Mager's alleged actions based on specific, first[-]hand evidence might be in order. If the investigation suggested that legal action might be appropriate, I might then refer the matter to an attorney with experience in actions for business torts. (Our own firm has very little experience in this area, and I would not feel comfortable in filing such an action against an Association homeowner.) There is currently not nearly enough time to take such actions. In fact, the statute of limitations may already have expired. . . .
>
> Although legal action is impossible, I would like to know the details, evidence and sources for your allegations, so that I can better understand the history and status of the Association. I would also like to know when and how you first received evidence of the allegations, and what that evidence was. Finally, I would like to know why you sent me such vague information on the allegations, and at such a late date.

*Id.* at 146a.

On the same day Receiver responded to the demand, Mr. Serota filed a Complaint, derivatively on behalf of the Association, in the Trial Court against Mr. Mager for intentional interference with business relations. In his Complaint, Mr. Serota alleged that Mr. Mager tortiously interfered with the Association's business relationship with its prior insurance carrier, Ironshore. Specifically, Mr. Serota averred that in September 2018, Mr. Mager informed the underwriter of the

Association's Directors and Officers policy that the Association was being dissolved, as well as "other statements framing the Association and its Executive Board negatively [so] as to cause an adverse impact on the Association's insurance policy renewal." Compl. ¶¶ 27, 28. Mr. Serota also averred:

> 29. On September 19, 2018, the [Association's] Executive Board first discovered the contact and communication(s) [Mr.] Mager had with the Ironshore underwriter of the Association's [p]olicy renewal when it was informed by the Association's insurance broker of the ramifications that occurred as a direct and proximate result of [Mr.] Mager's said communication(s).
>
> 30. The Executive Board was informed that the renewal policy offering that had been previously prepared by Ironshore for consideration by the Executive Board had been withdrawn.
>
> 31. The Association's existing policy with Ironshore expired in late October 2018.
>
> 32. Despite the comprehensive efforts of the Association's longtime insurance broker in late October and into November 2018, to obtain another insurance policy offering, he ultimately advised the Executive Board that he could not find any insurance carrier throughout his extensive network of carriers willing to insure the Association.
>
> 33. In May 2019, the Executive Board reached out to a different insurance broker on the possibility that a new broker could use their resources to potentially obtain a directors & officers policy offering for the Association's Executive Board to consider.
>
> 34. After being turned down by every carrier inquired upon, the new insurance broker eventually found just one carrier willing to offer a policy for consideration.
>
> 35. The Wesco Insurance Company in conjunction with certain underwriters of Lloyd[]s of London, offered a policy with a $25,000.00 annual premium, which was an increase of $21,059.00 from the $3,901.00 that was the premium for the renewal proposed policy to the

6

Association by Ironshore prior to [Mr.] Mager's aforementioned communication(s) with the Ironshore underwriter that caused that offering to be withdrawn.

*Id.* ¶¶ 29-35. Mr. Serota alleged that Mr. Mager "purposefully . . . interfered with these business relations, intending to harm the Association's existing relationship with Ironshore." *Id.* ¶ 42.

Mr. Serota further alleged that, before filing his Complaint, he had made written demands of both Receiver and the Association's Executive Board to file suit to enforce the Association's rights. *Id.* ¶¶ 8, 9. In his prayer for relief, Mr. Serota requested the entry of judgment in his favor, as well as damages in the amount of $210,990, "together with punitive damages, costs, fees, [and] interest." Compl. at 7.

On December 8, 2020, Mr. Mager filed Preliminary Objections to the Complaint, after which Mr. Serota filed an Answer. In his Preliminary Objections, Mr. Mager asserted, *inter alia*, that Mr. Serota lacked standing to file a derivative action pursuant to Section 5781 of Nonprofit Law, 15 Pa. C.S. § 5781,[1] because "his demand lacked the necessary specificity" and because "Receiver determined that an action may not be brought based on the claims asserted by [Mr.] Serota. As a result, [Mr.] Serota was not given the power and authority to pursue these claims on the Association's behalf." R.R. at 126a. In response to the Preliminary Objections, Mr. Serota asserted, *inter alia*, that "[t]here is nothing in [the Nonprofit Law] . . . stating that . . . Receiver is permitted to unilaterally decide on behalf of the Association that a derivative action is not warranted." R.R. at 157a.

---

[1] The Association's By-Laws provide that the Association "shall be governed by the provisions of the [Nonprofit Law], as it may be amended from time to time." R.R. at 44a.

7

On February 18, 2021, following oral argument on the Preliminary Objections, the Trial Court entered an Order staying the litigation "pending a report and recommendation from . . . Receiver . . . regarding whether the claims [Mr.] Serota asserted in his demand letter . . . are in the best interest of the . . . Association." R.R. at 171a.

On June 15, 2021, Receiver issued his Report and Recommendation, wherein he determined that the present action was not in the Association's best interest and recommended that the action be dismissed. Receiver explained the results of his investigation and his reasoning as follows:

> In investigating the claims asserted by Mr. Serota, . . . Receiver solicited input from Mr. Serota, Mr. Mager[,] and Thomas Trimbur, the former insurance broker for the Association. Mr. Mager and Mr. Trimbur talked directly with me. I also requested input from [Mr.] Serota. Mr. Serota's attorney stated to me that Mr. Serota would be furnishing relevant information to me, but he did not do so.

> *The claims asserted by Mr. Serota in his demand letter and his derivative lawsuit against Mr. Mager must be evaluated in the light of the long history of litigation among Mr. Serota, the Association, and the members of the Association.* In 2016, Mr. Serota filed two lawsuits against the Association because of actions by the Association's Executive Board. One of these resulted in a judgment against the Association, and the other resulted in a settlement agreement which required the Association to pay substantial attorney[s'] fees to [Mr.] Serota.

> According to Mr. Trimbur, these lawsuits were the primary factor in the Association's difficulty in obtaining renewals of its Directors and Officers insurance. Since the filing of the two original lawsuits, many additional lawsuits have been filed against the Association or individual members of it, mostly by [Mr.] Serota. In 2019, [Concerned Owners] filed a Complaint against the Association and one of its former members, which resulted in . . . Receiver being appointed. In 2020, Mr. Serota responded by filing several lawsuits

8

against individual Association homeowners, including the [lawsuit] which . . . Receiver has been asked to evaluate. In 2021, [Mr.] Serota . . . filed numerous defamation actions against individual homeowners. *All of these lawsuits have drained the Association's funds, impeded the functioning of the Association and created severe enmity among members of the Association. A decrease, not an increase, in the number of lawsuits involving the Association would be in its best interest. Furthermore, any benefit to the Association from the lawsuit under review may be negligible, as both liability and damages are doubtful. . . .*

*Id.* at 175a-76a (emphasis added).

Receiver also stated that his investigation revealed that "the Association's insurance coverage lapsed because the Association decided not to renew it, . . . not because of a call from Mr. Mager." *Id.* at 176a. Finally, Receiver opined that Mr. Serota's derivative action was likely barred by the two-year statute of limitations for tort claims in Section 5524(7) of the Judicial Code, 42 Pa. C.S. § 5524(7).[2] *Id.*

On July 9, 2021, the Trial Court dismissed Mr. Serota's Complaint with prejudice, accepting Receiver's recommendation and concluding that dismissal of the action was "in the best interest of the [Association]." R.R. at 181a.[3]

---

[2] Section 5524(7) of the Judicial Code provides a two-year statute of limitations for "[a]ny . . . action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct . . . ."

Despite Receiver's belief that the "statute of limitations may already have expired" based on the alleged tortious conduct occurring in September 2018, R.R. at 146a, Mr. Serota's August 31, 2020 demand tolled the statute of limitations. *See* 15 Pa. C.S. § 5781(e).

[3] In its July 9, 2021 Order, the Trial Court did not specifically rule on Mr. Mager's Preliminary Objections. However, even though the Trial Court did not state in its Order that it was sustaining the Preliminary Objections, it concluded that Mr. Serota lacked standing to file a derivative suit and granted the precise relief Mr. Mager requested – dismissal of the Complaint – and subsequently clarified its ruling in its Pa.R.A.P. 1925(a) Opinion. *See* R.R. at 224a ("[The Trial] Court did not err in *sustaining the* [P]*reliminary* [O]*bjections to Mr. Serota's derivative claim and dismissing this case*.") (emphasis added).

In its subsequent Pa.R.A.P. 1925(a) Opinion, the Trial Court began its analysis by summarizing the history of litigation, spanning six years, between Mr. Serota and the Association. *Id.* at 215a. With regard to the allegations in Mr. Serota's Complaint, the Trial Court found: "Mr. Serota asserts that it was Mr. Mager's alleged contact with Ironshore that caused the policy not to be renewed. However, *Mr. Serota's ability to demonstrate whether Mr. Mager actually contacted Ironshore or the insurance broker, what was said between them, and whether this had any effect on renewal of the insurance policy is dubious*." *Id.* (emphasis added).

The Trial Court then explained its reasons for accepting Receiver's recommendation to dismiss Mr. Serota's derivative suit as follows:

> Arguably, Mr. Serota's demand fell short of the "reasonable specificity" required of the demand, as his allegations and the facts upon which he relied to make them were vague. Assuming, for the sake of argument, that his demand was sufficient, the Association ultimately refused to initiate its own lawsuit. *Mr. Serota argues that the Association's refusal to sue confers upon him the right to maintain this derivative action because the requirements of Section 5781(a) of [the Nonprofit Law, 15 Pa. C.S. § 5781(a),] have been satisfied. However, the inquiry does not end there.*
>
> Notwithstanding the Association's refusal to sue after Mr. Serota made his demand, Mr. Serota's derivative action may be dismissed for two related reasons. *First*[]*, Mr. Serota cannot maintain a derivative suit if the Association's refusal is protected by the business judgment rule. Second*[]*, it was not the Association's Executive Board that refused to initiate a suit against Mr. Mager, but . . . Receiver, . . . whom this Court appointed to oversee the Association's affairs. Although Pennsylvania law is sparse on this issue, persuasive authority provides that a receivership affects the rights of an association member to maintain a derivative action on the association's behalf.*

*Id.* at 218a-19a (internal citations omitted) (emphasis added).

10

The Trial Court also rejected Mr. Serota's claim that Receiver was required to appoint a special litigation committee to investigate his demand before refusing to file suit, concluding that, under the circumstances of this case, Receiver, as a neutral third party, was capable of performing that function. The Trial Court explained:

> [T]his Court, by its Order of February 18, 2021, directed [Receiver] to determine whether bringing the instant suit against Mr. Mager would be in the best interest of the Association. However, *appointing a special litigation committee to make such a determination would have been an empty pro forma exercise and a waste of the Association's time and resources*. Although [the Nonprofit Law] provides a safe harbor for corporations that appoint a special litigation committee, 15 Pa. C.S.[ §§] 5781, 5783, *a committee is not strictly necessary if the decision of the board (or its receiver) is nevertheless disinterested and grounded in reason.* If that was not the case, a nonprofit corporation would be bullied into spending resources in appointing a special litigation committee upon every demand to sue for an insignificant offense conjured by a particularly litigious member. *The point of a special litigation committee is primarily to investigate claims against members of the board itself for fraud, where the board members would obviously be partial in conducting their own investigation. Here, Mr. Serota did not bring a derivative action against the Association's Board, but against Mr. Mager*[,] *who is "a person other than a director, senior executive, or person in control of the corporation."*

*Id.* at 221a-22a (footnotes omitted) (emphasis added). Thus, the Trial Court determined that "Receiver was capable of exercising independent judgment as to the best interests of the Association and satisfying the business judgment rule, notwithstanding the absence of a special litigation committee." *Id.* at 222a.

The Trial Court then concluded:

> *Not only is* [*Receiver*] *an independent and disinterested third party, but his decision that the instant action is not in the Association's best interest was well-reasoned, investigated as thoroughly as could be*

11

*expected after more than two years [had] passed since the facts giving rise to the claim, and delivered to the [Trial] Court in a written report. [Receiver's] determination that this lawsuit would not be in the best interest of the Association is supported by a variety of reasons in his report.* For example, [Receiver] noted that, whatever role Mr. Mager may have played in interfering with the renewal of the Ironshore policy, the Association's difficulty in securing insurance stemmed largely from Mr. Serota's own litigiousness against the Association. [Receiver] also determined that these lawsuits had drained the Association of its funds. Accordingly, [Receiver] rationally believed that "[a] decrease, not an increase, in the number of lawsuits involving the Association would be in its best interest." [Receiver] also considered the merits of the claim itself. After speaking with the Association's insurance broker, [Receiver] determined that the Association itself had elected not to renew the policy, vitiating any interference Mr. Mager allegedly caused. *These circumstances are more than sufficient to justify application of the business judgment rule and to dismiss Mr. Serota's derivative action.*

*Id.* at 222a-23a (emphasis added).

Finally, the Trial Court noted that "jurisdictions with more developed case[ ]law on point have suggested that where a corporation is in receivership[,] a derivative action cannot be maintained absent consent of the receiver or the court appointing the receiver." *Id.* at 223a (citing *Fields v. Fidelity Gen. Ins. Co.*, 454 F.2d 682, 685 (7th Cir. 1971)).[4] The Trial Court concluded:

Receiver was empowered by th[e Trial] Court to conduct the business of the Association, including determining whether to bring the instant action. As such, . . . Receiver was the only party vested with the right to unilaterally decide whether or not Mr. Serota could maintain his derivative action, so long as th[e Trial] Court has found that such a decision has satisfied the business judgment rule.

---

[4] The Trial Court also cited *Klein v. Peter*, 284 F. 797 (8th Cir. 1922), *Tankersley Inv. Co. ex rel. Tankersley v. Tankersley*, 189 P.2d 415 (Ok. 1948), and *Waller v. Waller*, 49 A.2d 449 (Md. 1946).

*Id.* at 224a-25a.  Mr. Serota now appeals to this Court.[5]

## II. <u>Analysis</u>

On appeal, Mr. Serota asserts that, in dismissing his derivative action, the Trial Court misapplied both the requirements for derivative actions in the Nonprofit Law and the business judgment rule.  Mr. Serota contends that, under Sections 5781 and 5783 of the Nonprofit Law, the only way the Association can prevent a derivative action by a member is to either:  (1) file its own lawsuit within a reasonable time after receiving a demand, or (2) form a special litigation committee (comprised of two or more disinterested individuals) to investigate the demand and determine whether pursuing an action is in the Association's best interest.  Instead, the Trial Court authorized Receiver, an officer of the court, to perform the function of a duly appointed special litigation committee.  Mr. Serota contends that the Trial Court erred in granting Receiver sole and exclusive authority to determine whether a lawsuit was in the Association's best interest, when Section 5783 of the Nonprofit Law requires a special litigation committee to make such a determination.

The issue of a receiver's powers with regard to derivative actions under the Nonprofit Law appears to be one of first impression in Pennsylvania.  Our research has revealed no Pennsylvania precedent involving a derivative action by a member of a nonprofit corporation that is under any form of receivership.

---

[5] Our review of a trial court's order sustaining preliminary objections and dismissing a complaint is limited to determining whether the trial court abused its discretion or committed an error of law.  *Petty v. Hosp. Serv. Ass'n of Ne. Pa.*, 967 A.2d 439, 443 n.7 (Pa. Cmwlth. 2009), *aff'd*, 23 A.3d 1004 (Pa. 2010).

## A. Derivative Actions Under Nonprofit Law

We begin our analysis by reviewing the statutory requirements for derivative actions under the Nonprofit Law. At the time of the Trial Court proceedings in this case, Section 5781(a)(1)(i) and (ii) of the Nonprofit Law stated in relevant part:

> [A] plaintiff may maintain a derivative action to enforce a right of a nonprofit corporation *only if*:
>
> (1) *the plaintiff first makes a demand on the corporation or the board of directors*, requesting that it cause the corporation to bring an action to enforce the right, *and*:
>
>> (i) *if a special litigation committee is not appointed* under [S]ection 5783 (relating to special litigation committee), *the corporation does not bring the action within a reasonable time*; or
>>
>> (ii) *if a special litigation committee is appointed* under [S]ection 5783, a determination is made:
>>
>>> (A) under [S]ection 5783(e)(1) that *the corporation not object to the action*; or
>>>
>>> (B) under [S]ection 5783(e)(5)(i) that *the plaintiff continue the action*[] . . . .

*Former* 15 Pa. C.S. § 5781(a)(1)(i) and (ii).[6] Under the plain language of former Section 5781(a)(1)(i), if the board does not appoint a special litigation committee

---

[6] Section 5781(a)(1)(i) of the Nonprofit Law was subsequently amended on November 3, 2022, P.L. 1791 (effective January 3, 2023). Section 5781(a)(1)(i) now states:

> [A] plaintiff may maintain a derivative action to enforce a right of a nonprofit corporation *only if*:
>
> (1) *the plaintiff first makes a demand on the corporation or the board of directors*, requesting that the corporation bring an action to enforce the right, *and*:

**(Footnote continued on next page…)**

14

after receiving a demand, then the plaintiff may file a derivative action if the corporation does not file an action within a reasonable time.

Rather than filing its own action in response to a demand, however, the board of directors may choose to first appoint a special litigation committee to investigate the claims in the demand. With regard to special litigation committees, Section 5783(a) of the Nonprofit Law provides:

> If a nonprofit corporation or the board of directors receives a demand to bring an action to enforce a right of the corporation, . . . *the board may appoint a special litigation committee to investigate the claims asserted in the demand or action and to determine on behalf of the corporation or recommend to the board whether pursuing any of the claims asserted is in the best interests of the corporation.* The corporation must deliver a notice in record form to the person making the demand[] . . . promptly after the appointment of a committee under this section notifying the person making the demand . . . that a

---

> (i) *if a special litigation committee is not appointed* under section 5783 (relating to special litigation committee), *the board determines that*:
>
> > (A) an action based on some or all of the claims asserted in the demand not be brought by the corporation but that the corporation not object to an action being brought by the party that made the demand; *or*
> >
> > (B) an action already commenced continue under the control of the plaintiff[] . . . .

15 Pa. C.S. § 5781(a)(1)(i). Because the amendment took effect after Mr. Serota filed his appeal, we apply the prior statutory language applicable at the time of the Trial Court proceedings. *See* Section 1953 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1953 (stating that "new [amendatory] provisions shall be construed as effective *only from the date when the amendment became effective*") (emphasis added); *see also S.D. Richman Sons, Inc. v. Bd. of Fin. & Revenue*, 416 A.2d 1161, 1164 (Pa. Cmwlth. 1980) ("[A]lthough an amendment to a statute is to be construed as merging into and becoming a part of the original statute . . . , *it still is to be construed as effective only from the date when the amendment became effective*.") (emphasis added).

15

committee has been appointed and identifying by name the members of the committee.

15 Pa. C.S. § 5783(a) (emphasis added). Section 5783(c) provides that, if appointed, a special litigation committee "shall be composed of *two or more individuals* who: (1) are *not interested in the claims asserted* in the demand or action; (2) are *capable as a group of objective judgment* in the circumstances; and (3) may, but need not, be members, directors or members of another body." *Id.* § 5783(c) (emphasis added). Further, Section 5783(e)(4) and (7) permits the board of directors to determine that "an action not be brought based on any of the claims asserted in the demand" or that "an action already commenced be dismissed," but only "[a]fter appropriate investigation by a special litigation committee." *Id.* § 5783(e)(4) and (7).

## B. Receiver's Authority

We now turn to the role of a receiver *pendente lite* who is appointed to oversee the involuntary winding up and dissolution of a nonprofit corporation, as in this case. Section 5984 of the Nonprofit Law provides:

> Upon the filing of an application under this subchapter, the court may issue injunctions, *appoint a receiver pendente lite with such powers and duties as the court from time to time may direct and proceed as may be requisite to preserve the corporate assets wherever situated and carry on the business of the corporation* until a full hearing can be had.

15 Pa. C.S. § 5984 (emphasis added).

On appeal, Mr. Serota argues that Trial Court erred in granting Receiver the exclusive authority to determine whether a derivative action was in the Association's best interest without appointing a special litigation committee as required by Section 5783 of the Nonprofit Law. We disagree.

As both the parties and the Trial Court acknowledge, there is no Pennsylvania law specifically addressing the powers of a receiver with regard to derivative actions

16

under the Nonprofit Law. However, we are able to glean the following general principles from our case law regarding receiverships.

Once appointed, a receiver is "the officer, the executive hand, of a court of equity." *Warner v. Conn*, 32 A.2d 740, 741 (Pa. 1943). As an officer of the court, "[a] receiver has *only such powers and authorities as are given him by the court* and must not exceed the prescribed limits." *Cont'l Bank & Tr. Co. v. Am. Assembling Mach. Co.*, 38 A.2d 220, 224 (Pa. 1944) (emphasis added); *see also Rappaport v. Stein*, 520 A.2d 480, 483 (Pa. Super. 1986) ("The hallmark of any receivership[] . . . is the removal of all possession and control from the owners of the [corporation] and the transfer thereof to the receiver, *who acts as the officer of the appointing court*.") (emphasis added). In other words, a receiver is subject to the discretion and control of the court and has no powers other than those conferred upon him by the order of his appointment. As such, we must look to the orders appointing Receiver in this case, as well as the circumstances surrounding the appointment, to determine the precise authority conferred upon him by the Trial Court. *See Witt v. Dep't of Banking*, 425 A.2d 374, 376 (Pa. 1981); *see also Duplex Printing Press Co. v. Clipper Publ'g Co.*, 62 A. 841, 842 (Pa. 1906) ("The authority of a receiver and the effect of his action depend almost entirely on the purpose of his appointment and the extent of his powers conferred by the decree appointing him.").

Here, the Trial Court appointed Receiver on a temporary basis in response to Concerned Owners' Petition, pursuant to Section 5984 of the Nonprofit Law. *See* R.R. at 219a (citing 15 Pa. C.S. § 5984); *id.* at 94a. At the time of the appointment, there was no functioning Executive Board in place, because a majority of unit owners had voted to remove the existing Board and two of the three Board members had voluntarily resigned from their positions. The Trial Court's July 18, 2019 Order

17

appointing Receiver initially limited his authority to "address[ing] [Concerned Owners'] concerns [raised in their Petition] and mak[ing] recommendations in that regard" and "collect[ing] assessments and mak[ing] disbursements within the regular course of business." *Id.* at 94a.

On December 12, 2019, however, the Trial Court entered a second Order further clarifying Receiver's powers. In its December 12, 2019 Order, the Trial Court granted Receiver the authority to "*conduct the business of the* [*Association*] *on a continuing basis from July 18, 2019*[,] . . . *forward* until issuance of a new Order of [the Trial] Court . . . ." *Id.* at 98a (emphasis added). That Order also expressly prohibited the Executive Board "from individually or collectively exercising *any powers of the Association, including but not limited to all those powers granted to . . . Receiver* by this Order of [the Trial] Court." *Id.* at 99a (emphasis added). By way of these appointment orders, the Trial Court gave Receiver broad authority to conduct *all* business and functions of the Association and its Executive Board until further order of the Trial Court.

Moreover, Section 5984 of the Nonprofit Law, under which Receiver was appointed, authorized the Trial Court to grant Receiver "such powers and duties *as the court from time to time may direct and proceed as may be requisite to preserve the corporate assets*." 15 Pa. C.S. § 5984 (emphasis added). Here, the Trial Court believed that the best way to preserve the Association's assets, in the face of Mr. Serota's derivative action, was to authorize Receiver, a neutral third party, to investigate Mr. Serota's claims and determine whether a lawsuit would benefit or cause further harm to the Association, given the long history of litigation between Mr. Serota and the Association. As the Trial Court cogently explained:

18

> [*A*]*ppointing a special litigation committee to make such a determination would have been an empty pro forma exercise and a waste of the Association's time and resources.* Although [the Nonprofit Law] provides a safe harbor for corporations that appoint a special litigation committee, 15 Pa. C.S.[ §§] 5781, 5783, *a committee is not strictly necessary if the decision of the board (or its receiver) is nevertheless disinterested and grounded in reason. If that was not the case, a nonprofit corporation would be bullied into spending resources in appointing a special litigation committee upon every demand to sue for an insignificant offense conjured by a particularly litigious member.* The point of a special litigation committee is primarily to investigate claims against members of the board itself for fraud, where the board members would obviously be partial in conducting their own investigation. Here, Mr. Serota did not bring a derivative action against the Association's Board, but against Mr. Mager[,] who is "a person other than a director, senior executive, or person in control of the corporation."

R.R. at 221a-22a (footnotes omitted) (emphasis added).

This case is not a typical situation in which a shareholder or member of a corporation asks the board of directors to pursue an action on behalf of the corporation, because here a temporary receiver had been appointed to keep the Association functioning while the Executive Board was in turmoil and the Association's assets were depleting. The Trial Court undoubtedly has wide latitude under the Nonprofit Law to direct Receiver's powers and duties "and [to] *proceed as may be requisite to preserve the corporate assets.*" 15 Pa. C.S. § 5984 (emphasis added). The Trial Court determined that a special litigation committee would have served no practical purpose and was not required, given Receiver's broad powers to act on the Executive Board's behalf pursuant to the appointment orders. *See* R.R. at 222a ("Not only is [Receiver] an independent and disinterested third party, but his decision that the instant action is not in the Association's best interest was well-reasoned, investigated as thoroughly as could be expected after more than two years

19

[had] passed since the facts giving rise to the claim, and delivered to the [Trial] Court in a written report."). Under these circumstances, we conclude that the Trial Court did not err in authorizing Receiver, rather than a special litigation committee, to investigate Mr. Serota's demand and determine whether a derivative action was in the Association's best interest.

## C. Business Judgment Rule

Finally, Mr. Serota asserts that the Trial Court misapplied the business judgment rule, first adopted by the Pennsylvania Supreme Court in *Cuker v. Mikalauskas*, 692 A.2d 1042 (Pa. 1997), in accepting Receiver's recommendation and dismissing his derivative action. We disagree.

*Cuker* involved two shareholder derivative actions, alleging similar facts, filed against the directors and officers of PECO Energy Company (PECO). PECO moved to dismiss both actions following the recommendation of a special litigation committee that the actions were not in PECO's best interest. The issue before the Supreme Court was "whether the business judgment rule permits the board of directors of a Pennsylvania corporation to terminate derivative lawsuits brought by minority shareholders." *Id*. at 1045. The *Cuker* Court explained the business judgment rule as follows:

> *The business judgment rule insulates an officer or director of a corporation from liability for a business decision made in good faith* if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation.

*Id*. (emphasis added). The Supreme Court went on to state:

20

> *Decisions regarding litigation by or on behalf of corporation, including shareholders' derivative actions, are business decisions* as much as any other financial decisions*, are within the province of the board of directors and are, unless taken in violation of common law or a statutory duty, within the scope of business judgment rule*.

*Id.* at 1048 (emphasis added).

The *Cuker* Court then outlined the factors to be considered when evaluating a board's decision to terminate a shareholder derivative action as follows:

> Factors bearing on the board's decision will include *whether the board or its special litigation committee was disinterested, whether it was assisted by counsel, whether it prepared a written report, whether it was independent, whether it conducted an adequate investigation, and whether it rationally believed its decision was in the best interests of the corporation (i.e., acted in good faith).* If all of these criteria are satisfied, the business judgment rule applies and the court should dismiss the action.

*Id*. (emphasis added). If application of these factors shows that the corporation's decision not to sue was reasoned and impartial, then "the court should dismiss the action." *Id.* In so holding, the Supreme Court expressly adopted Sections 7.02-7.10 and 7.13 of the American Law Institute's Principles of Corporate Governance (1994) (ALI Principles), setting forth the requirements for shareholder derivative actions, which the Court appended to its opinion. *Id.* at 1049.

Although this case is factually distinct from *Cuker*, because there the PECO board moved to dismiss the actions after a special litigation committee had investigated the claims, we agree with the Trial Court that application of the business judgment rule is not limited to that precise fact pattern. The rule also applies to a decision made by the board (or in this case, a receiver acting on the board's behalf), absent investigation by a special litigation committee. *See* ALI Principles § 7.07(a)(1) ("The court . . . should dismiss the [derivative] action as against one or

21

more of the defendants based on a motion *by the board* or a properly delegated committee requesting dismissal of the action as in the best interests of the corporation if[] *. . . the determinations of the board* or committee *. . . satisfy the requirements of the business judgment rule . . . .*") (emphasis added).

Here, Receiver, acting on behalf of the Association's Executive Board, was expressly authorized by the Trial Court, consistent with Section 5984 of the Nonprofit Law, to evaluate Mr. Serota's demand and determine whether a derivative action was in the Association's best interest. *See* R.R. at 225a ("Receiver was capable of exercising independent judgment as to the best interests of the Association and satisfying the business judgment rule, notwithstanding the absence of a special litigation committee."). As in *Cuker*, the Trial Court examined the circumstances surrounding Receiver's decision and determined that application of the business judgment rule was warranted, because Receiver was disinterested, prepared a written report, was independent, conducted an adequate investigation, and rationally believed his decision was in the Association's best interest. *See Cuker*, 692 A.2d at 1048 ("If all of these criteria are satisfied, *the business judgment rule applies and the court should dismiss the action*.") (emphasis added). Therefore, we conclude that the Trial Court did not err in deferring to Receiver's recommendation under the business judgment rule.

### III. Conclusion

In sum, we conclude that the Trial Court properly authorized Receiver, rather than a special litigation committee, to investigate Mr. Serota's demand and determine whether a derivative action was in the Association's best interest under the circumstances of this case. In doing so, the Trial Court acted well within its authority under Section 5984 of the Nonprofit Law to direct Receiver's powers and

duties "and [to] proceed as may be requisite to preserve the corporate assets." 15 Pa. C.S. § 5984. We further conclude that the Trial Court properly deferred to Receiver's recommendation to dismiss Mr. Serota's derivative action under the business judgment rule. Accordingly, we affirm the Trial Court's Order.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Matthew Serota, derivatively on :  
behalf of London Towne :  
Homeowners Association :  
  :  
v. : No. 820 C.D. 2021
  :  
Matthew J. Mager a/k/a Matt :  
Mager :  
  :  
Appeal of: Matthew Serota :  

# **O R D E R**

AND NOW, this 7th day of November, 2023, the July 9, 2021 Order of the Court of Common Pleas of Allegheny County is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge